30 P.3d 504 (2001)
ONE PACIFIC TOWERS HOMEOWNERS' ASSOCIATION; Janet Abrams, an individual; Daniel H. Anderson and Helen M. Anderson, husband and wife; Mark Baerwaldt, an individual; Thomas V. Giddens, Jr., as personal representative for the Thomas V. Giddens, Jr. Trust; Kenneth Hayes, an individual; Michael Montgomery, an individual; Monique Wendt, an individual; Michael O'Connell and Theresa O'Connell, husband and wife; Sherry Samuelson, an individual; Jon Staenberg, an individual; Jeffrey Swanson, an individual; Lawrence Taubman, an individual; Bradford C. Walker and Lisa M. Walker, husband and wife; and Wayne Willich and Christine Willich, husband and wife, Appellants,
v.
HAL REAL ESTATE INVESTMENTS, INC., a Washington corporation; OPT Holdings, Inc., a Washington corporation; OPT II, Inc., a Washington corporation; OPT III, Inc., a Washington corporation; OPT IV, Inc., a Washington corporation; OPT V, Inc., a Washington corporation; OPT VI, Inc., a Washington corporation; OPT VII, Inc., a Washington corporation; Paul Manheim and Vivienne Manheim, husband and wife; Hal Real Estate Investments, N.V., a Netherlands Antilles corporation; Hal Holding N.V., a Netherlands Antilles corporation; and Hal Trust, a Bermuda trust, Respondents.
No. 46815-4-I.
Court of Appeals of Washington, Division 1.
September 4, 2001.
*506 Mark C. McPherson, Lynne Michele Cohee, Hillis, Clark, Martin & Peterson, P.S., Seattle, for Appellants.
Arthur Washington Harrigan, Jr., Timothy George Leh, Katherine See Kennedy, Danielson, Harrigan & Tollefson, Seattle for Respondents.
*505 COX, J.
At issue in this case of first impression is whether a holding corporation, its subsidiaries, and others were "declarants" or "dealers" under the Washington condominium act[1] for certain sales. If they were, the condominium act required that they provide their purchasers with public offering statements. We must also decide whether the trial court properly exercised its discretion in assessing attorney fees against the Pacific Towers Homeowners' Association and the plaintiff condominium purchasers (collectively, "Owners") who brought this action.
Because the holding corporation and its subsidiaries did "succeed to" special declarant rights under the circumstances of this case, they were "declarants" under the condominium act. Thus, they were required to prepare and deliver public offering statements to the purchasers who bought condominium units from them. Accordingly, we reverse the trial court's decision to the extent that it concluded otherwise.
We further hold that the Owners have not shown that the holding corporation, its subsidiaries, or any other respondent had the "right to acquire" six or more condominium units. Thus, they were not "dealers" under the condominium act. We further hold that the facts of this case do not warrant piercing the corporate veil of any corporate entity or otherwise imposing personal liability. Based on these conclusions, we affirm the trial court's decision to the extent that it is consistent with these holdings.
Finally, we hold that the trial court erred by assessing attorney fees against the Owners and denying their request for such fees. Accordingly, we reverse the fee award, and award fees for the proceedings below and on appeal to the Owners. We remand to the trial court for it to determine the reasonable amount of such fees and to conduct such *507 further proceedings that are not inconsistent with this opinion.
One Pacific Towers is a 75 unit condominium development in downtown Seattle. OPT-1 Limited Partnership ("Limited Partnership"), whose general partner was Vyzis Residential Properties, Inc., was the developer and original declarant of the development. Basil Vyzis was the principal of the corporate general partner.
After Vyzis died, a representative of his estate approached HAL Real Estate Investments, Inc. (HAL) to see if it would be interested in purchasing 30 unsold residential units of the development, together with a commercial unit and the entire parking garage. HAL formed a holding corporation, OPT Holdings, Inc., to assist in the purchase. OPT Holdings then created six subsidiaries, OPT II through OPT VII, each of which had the sole purpose of purchasing and reselling five condominium units. Each subsidiary executed, as purchaser, a residential purchase agreement with the Limited Partnership, as seller, to purchase five residential condominium units. OPT Holdings, Inc. executed an agreement with the Limited Partnership to purchase one commercial unit and the entire parking garage of the development. Thus, OPT Holdings, Inc. and its six subsidiaries (collectively, "the OPT entities") purchased, at closing, the 30 unsold residential condominium units plus a commercial unit and the parking garage.
Paul Manheim is the sole officer and director of HAL and the OPT entities. Neither Manheim nor any of his corporate entities is related either to OPT-1 Limited Partnership or to any of its affiliates.
Prior to closing of the sales transaction, the Limited Partnership and the OPT entities executed a Supplemental Agreement. It provided, among other things, that the Limited Partnership would not "transfer or exercise" any special declarant rights until the OPT entities authorized such "transfer or exercise." The Supplemental Agreement further provided that the OPT entities could direct the Limited Partnership to assign to them "the Special Declarant Rights to maintain sales offices, erect signage, and operate model units." In June 1997, after the closing of the sales and pursuant to direction by the OPT entities, the Limited Partnership transferred the special declarant rights directly to the Homeowners Association. At no time did the Limited Partnership ever transfer such rights to the OPT entities.
In the months that followed closing of the sales from the Limited Partnership to the OPT entities, OPT II through OPT VII operated two model units at One Pacific Towers, one of which contained a sales office. These same entities also made improvements to the lobby and common areas, and hired an interior design firm to help finish the remaining units that they owned. In addition, OPT II through VII hired a marketing firm to help advertise and sell their condominium units. They also maintained signs advertising condominium units for sale at One Pacific Towers.
OPT II through VII provided resale certificates, not public offering statements, to their purchasers.
In September 1999, the Owners commenced this declaratory judgment action against the OPT entities and others for statutory penalties based on the failure to provide public offering statements. The Owners also sought attorney fees. They claimed that the OPT entities and others were "declarants" and/or "dealers" under the condominium act; were required to provide purchasers with public offering statements, not just resale certificates; and were liable for statutory penalties under the condominium act. On cross-motions for summary judgment, the trial court concluded that none of the respondents was either a "declarant" or a "dealer." Thus, the court determined they had no obligation to prepare or deliver to any purchaser a public offering statement. The trial court later awarded $73,894 in attorney fees pursuant to RCW 64.34.455 against the Owners.
The Owners appeal.

Declarant Liability
The Owners argue that HAL and the OPT entities did "succeed to" and "reserve" special declarant rights, and thus had an obligation to provide public offering statements to their purchasers. We hold that the *508 OPT entities did succeed to special declarant rights by the control and exercise of those rights. Because they "succeeded to" special declarant rights, they had the duty to prepare and provide public offering statements to their purchasers.
We may affirm an order granting summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[2] We consider all facts and reasonable inferences in the light most favorable to the nonmoving party.[3] We review questions of law de novo.[4]
Here, the facts are largely undisputed, and there are no genuine issues of material fact. Thus, our task is to determine whether any moving party is entitled to judgment as a matter of law.
RCW 64.34.405(1) requires that a declarant provide purchasers with a public offering statement. The statute states that:
Except as provided in subsection (2) of this section or when no public offering statement is required, a declarant shall prepare a public offering statement conforming to the requirements of RCW 64.34.410 and 64.34.415.[[5]]
Subsection (2) of RCW 64.34.405 is not at issue in this appeal. Moreover, neither the OPT entities nor the other respondents argue that the "when no public offering statement is required" clause is at issue here. Rather, the OPT entities claim that they are not "declarant[s]" within the meaning of the statute. Our task is to determine whether their claim is valid.
As the name suggests, a public offering statement is a disclosure document. It must contain a detailed list of information about the declarant, the project history of the declarant, the condominium itself, and other matters.[6]
RCW 64.34.020(13) defines a declarant as "any person or group of persons acting in concert who (a) executes as declarant a declaration as defined in subsection (15) of this section, or (b) reserves or succeeds to any special declarant right under the declaration."[7] Special declarant rights include
"rights reserved for the benefit of a declarant to: (a) Complete improvements indicated on survey maps and plans filed with the declaration.... (c) maintain sales offices, management offices, signs advertising the condominium, and models.... (d) use easements through the common elements for the purpose of making improvements within the condominium...."[8]
Here, the Limited Partnership was the original declarant and had special declarant rights. The record shows that those rights were the subject of specific contractual terms in the Supplemental Agreement that the Limited Partnership executed with the OPT entities prior to the closing of the sales. Thus, for purposes of analyzing subsection (b) of the definition of declarant, the question is whether the OPT entities either "reserve[d]" or "succeed[ed] to" any special declarant rights.
When reading a statute, we will not construe language that is clear and unambiguous, but will instead give effect to the plain language without regard to rules of statutory construction.[9] But where a statute is unclear or ambiguous, we apply rules of statutory construction to determine the Legislature's intent and purpose.[10] We will construe statutes to avoid strained or absurd results.[11]
*509 The Owners argue that the OPT entities "succeeded" to special declarant rights because they in fact "controlled and exercised" such rights. We agree.
The condominium act does not define the phrase "succeed to." In the absence of a specific statutory definition, we will give words their ordinary meaning, which we may determine by referring to a dictionary definition.[12] In determining the meaning of a word as it appears in a statute, we should not employ "[a] mechanistic use of statutory construction rules [that] would lead us astray from our paramount duty, which is `to ascertain and give expression to the intent of the Legislature.'"[13] When faced with determining "the meaning of words used but not defined within a statute," we will "give careful consideration to the subject matter involved, the context in which the words are used, and the purpose of the statute."[14] If statutory language is susceptible to two constructions, one of which will promote the purpose of the statute and the second of which will defeat it, we will adopt the former construction.[15]
Turning to the phrase "succeeds to," we look to several dictionary definitions to assist us in construing that term as it is used in the statute. Black's Law Dictionary defines a "successor in interest," as "[o]ne who follows another in ownership or control of property....."[16] Courts have recognized this principal in holding that one may succeed to the rights of another by operation of law.[17]
Black's definition of "successor" is consistent with the above concept of control of property:

A person who succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows another.[18]
And Webster's defines "succession" as follows:
The change in legal relations by which one person comes into the enjoyment of or becomes responsible for one or more of the rights or liabilities of another person: the act or process of one person's taking the place of another in the enjoyment of or liability for his rights or duties or both.[19]
With these definitions in mind, we turn to the Supplemental Agreement that the Limited Partnership and the OPT entities executed prior to the closing of the sales. That agreement provided, in pertinent part, that:
Exercise of Development Rights. Seller agrees to cause the [Limited Partnership] not to transfer or exercise any Development Rights or Special Declarant Rights retained by [the Limited Partnership] in the Declaration unless and until [the OPT entities] grants approval for the transfer or exercise of those rights..... In addition, at [the OPT entities'] request, Seller shall cause Declarant to assign to [the OPT entities] the Special Declarant Rights to maintain sales offices, erect signage, and operate model units. [The OPT entities] shall indemnify and hold Seller harmless from any costs, liabilities and damages *510 arising from action taken by the Declarant at the direction of [the OPT entities].[[20]]
Applying the principles of the above definitions to the phrase "succeeds to" in RCW 64.34.020(13)(b) and further applying that phrase to the above provisions of the agreement, we conclude that the OPT entities are declarants. Upon full execution of the Supplemental Agreement by the Limited Partnership and the OPT entities, the entities totally controlled the special declarant rights that the Limited Partnership held. From that time forward, the Limited Partnership no longer had the power to either transfer or exercise those rights except upon the express direction of the OPT entities. In short, substantially all of the beneficial interests of the special declarant rights passed to the OPT entities by virtue of the Supplemental Agreement.
It is significant to our analysis that the OPT entities exercised the special declarant rights they controlled by virtue of the agreement prior to directing the formal transfer of those rights from the Limited Partnership to the Homeowners Association. Specifically, they maintained sales offices, erected signage, and operated model condominium units in support of sales activities. The exercise of those special declarant rights buttresses our conclusion that the substance of the transaction evidenced by the Supplemental Agreement permitted the OPT entities to "succeed to" the special declarant rights. This is so, notwithstanding the absence of a formal transfer of those rights to the OPT entities as of the signing of the Supplemental Agreement.
Respondents argue that one may only "succeed to" a special declarant right by "transfer" in accordance with the statutory procedures set forth in RCW 64.34.316(1). That statute provides that:
No special declarant right, as described in RCW 64.34.020(29), created or reserved under this chapter may be transferred except by an instrument evidencing the transfer executed by the declarant or the declarant's successor and the transferee is recorded in every county in which any portion of the condominium is located.....[[21]]
We are not persuaded that one who "succeeds to" special declarant rights may do so only by a transfer evidenced by a duly executed and recorded instrument. We reach this conclusion for the following reasons.
First, the Legislature did not define a "declarant" as one who acquires special declarant rights by "transfer."[22] Rather, it defined a declarant as one who "succeeds to" such rights. When the Legislature uses different words in the same statute to deal with the same or similar subject matter, we presume that a different meaning is intended.[23] Had the Legislature intended the more restrictive definition of "transfer" to apply, it could have used that word in the definition of declarant. It did not. Instead, it chose the more expansive phrase, "succeeds to," to define a declarant. We think that choice is significant and this case illustrates why.
Second, while we note that the comments to RCW 64.34.316(1) state otherwise,[24] we disagree with the view that one may only "succeed to" special declarant rights by a duly executed and recorded instrument. The comments are not part of the Washington condominium act. Thus, they are not dispositive on the question of legislative intent that is at issue here. Moreover, the comments do not consider the significance of the Legislature's decision to use "succeed to" instead of "transfer" to define "declarant" in the act.
Third, to construe RCW 64.34.020(13) as the respondents suggest, and hold that the formalities of transfer of special declarant rights are prerequisites to succession to such rights, would sharply conflict with the *511 Legislature's intent to protect condominium purchasers. For example, as in this case, a party could totally control and exercise special declarant rights. Yet that same party could avoid declarant liability simply by choosing not to comply with the requirements of RCW 64.34.316(1). In view of the strong general consumer protection aspects of this statute, and the specific protections afforded by requiring public offering statements, we believe our construction of this statute is more consistent with legislative intent than the position respondents argue. We base this view, in part, on the Legislature's apparent intent in enacting the condominium act to encourage the active enforcement of warranties and to protect condominium purchasers.[25]
Fourth, the respondents argue that RCW 64.34.405(2) explains how one "succeeds to" the responsibility for issuing a public offering statement. This statute states that "[a] declarant may transfer responsibility for preparation of all or a part of the public offering statement to a successor declarant pursuant to RCW 64.34.316....." This statute is irrelevant to the question of how one "succeeds to" special declarant rights. How one declarant may transfer responsibility for preparing a public offering statement to a successor under RCW 64.34.316 says nothing about when one is a declarant.
Finally, the respondents do not dispute that they made certain improvements to the condominiums, maintained a sales office, two model units, and signs. But they nevertheless argue that they did not "exercise" any special declarant rights because they took these actions for the benefit of, and without opposition from, the Owners.
Whether the Owners opposed the actions taken by the OPT entities is not material. The fact remains that the OPT entities controlled and exercised rights that are characterized by the condominium act as special declarant rights.
The fact that there was no formal transfer of special declarant rights to the OPT entities pursuant to RCW 64.34.316(1) did not preclude them from succeeding to special declarant rights by contract. They did so succeed here.
Because the OPT entities "succeeded to" special declarant rights under the circumstances here, they were "declarants" as defined by RCW 64.34.020(13). Accordingly, they had the statutory duty to prepare and deliver public offering statements to the purchasers of their condominium units. Here, each OPT entity sold a condominium unit to a purchaser without preparing or delivering the required statement. The OPT entities instead provided each purchaser with a resale certificate. They are liable for the statutory penalties for having failed to prepare or deliver public offering statements. On remand, the trial court shall determine what penalties apply.
The respondents also argue that, even assuming that they did "succeed to" special declarant rights and violate the condominium act by failing to record, the appropriate remedy for their failure to observe such statutory formalities is not the imposition of declarant status, but the loss of special declarant rights. But we see nothing in the statute to convince us that these remedies are mutually exclusive. An aggrieved party might be able to obtain injunctive relief against someone who attempts to exercise special declarant rights without complying with the requirements of RCW 64.34.316(1). But that does not strip one who fails to record of its declarant status, if that person so qualifies. Thus, the statutory penalties for a willful failure to deliver a public offering statement should apply in that situation.
To summarize, we conclude that the OPT entities succeeded to the special declarant rights initially held by the Limited Partnership by virtue of the Supplemental Agreement between those parties. Because of this determination, we need not address the Owners' alternative argument that the OPT entities qualify as declarants by having "reserv[ed]" special declarant rights.

*512 Personal Liability
The Owners next argue that Manheim is personally liable as a "declarant." First, they contend that Manheim is personally liable because he "acted in concert with" the OPT entities. Second, they argue that Manheim is personally liable because he approved of and participated in wrongful conduct by the OPT entities. Neither argument is persuasive.
As to their first argument, the Owners correctly note that the condominium act defines a "declarant" as "any person or group of persons acting in concert who .... succeeds to any special declarant right.'"[26] Relying on this definition, they assert that Manheim is a declarant because it is undisputed that he acted in concert with HAL and the OPT entities. The flaw in this argument is that the definition imposes declarant status only upon those who, acting alone or in concert, succeed to special declarant rights. Although the OPT entities "succeeded to" special declarant rights, Manheim did not. He did not sign the Supplemental Agreement in his individual capacity, but only as the Vice President of OPT Holdings and OPT II through VII. Because he did not "succeed to" special declarant rights, he is not a declarant.
The Owners next ask us to hold Manheim personally liable on the grounds that he participated in and approved of wrongful conduct by the OPT entities. Corporate officers may indeed face personal liability outside the theory of piercing the corporate veil under certain circumstances. Corporate officers may be personally liable for torts committed in the course of their duties.[27] "If a corporate officer participates in wrongful conduct or with knowledge approves of the conduct, then the officer, as well as the corporation, is liable for the penalties."[28]
In Ralph Williams, our Supreme Court held that a corporate officer could be personally liable for the deceptive practices of his automobile dealership, where he formulated and supervised its activities.[29] Among other things, the dealership in that case falsely claimed it sold cars at prices lower than other area car dealers and relied on advertisements that concealed defects in its vehicles.[30] It also used "a comprehensive sales system designed to confuse and deceive the customer," which included quoting prices lower than actual sales prices, misrepresenting the value that would be given on trade-in models, and giving the customer little opportunity to even read the contract.[31]
The court accordingly determined that such deceptive practices, which violated the Consumer Protection Act, constituted the type of wrongful conduct that warranted the imposition of personal liability on a participating corporate officer.[32]
Here, the actions by the OPT entities do not rise to the level of those condemned by the court in Ralph Williams. The Owners do not allege fraud or misrepresentation. The substance of their claims is that the corporations involved in sales were declarants under the condominium act and failed to comply with certain statutory duties imposed by that status. The fact that the OPT entities entered into the Supplemental Agreement with the Limited Partnership for the purpose of controlling the transfer and exercise of special declarant rights simply does not justify imposing personal liability on Manheim. On this record, we cannot say *513 that either the OPT entities or Manheim engaged in conduct so wrongful or deceptive that it would justify imposing personal liability on the corporations' sole corporate officer.

Dealer Liability
The Owners also argue that we should disregard the structuring of the transactions before us and hold Manheim and the OPT entities liable under the condominium act as "dealers." We decline to do so.
RCW 64.34.020(12) defines a "dealer" as "a person who owns or has a right to acquire either six or more units in a condominium or fifty percent or more of the units in a condominium containing more than two units. "A dealer who offers a unit to a purchaser must prepare and deliver a public offering statement.[33] The respondents clearly did not own "fifty percent or more" of the 75 units at One Pacific Tower. Accordingly, the primary issue here is whether the OPT entities had the "right to acquire" six or more units in the condominium.
Again, the condominium act does not define what the phrase "right to acquire" means. But in the context of the purchase and sale of the condominium units and the garage at issue here, we believe the meaning is that the right to acquire arises from a valid purchase and sale agreement for such units. This is not to exclude the possibility that the phrase may have other meanings in other contexts.
Here, six separate corporations, the OPT entities, executed separate purchase and sale agreements with the Limited Partnership. Nothing in the record establishes that any other entity had the "right to acquire" any condominium, by sale agreement or otherwise.
The Owners nevertheless argue that Manheim and HAL qualify as dealers because they "had the right to acquire six or more units." The source of such rights remains a mystery to us because there is simply nothing to substantiate this position. Accordingly, we do not further address this argument.
The Owners next argue that we should "disregard the corporate form of the OPT entities and collapse them into HAL." They also ask us to hold Manheim personally liable for statutory penalties and warranties on that basis. Neither argument is tenable.
Pointing to a letter from Manheim to Vyzis' widow that preceded the execution of the sales agreements to the OPT entities and the Supplemental Agreement, the Owners argue that Manheim deliberately used the corporate form to evade a legal duty:
In order to avoid incurring "dealer" liability under the condominium statute, we will create eight new subsidiaries, each of which will purchase a portion of the property.... Six of the new subsidiaries will each purchase five of the Residential Units..... As a result, there will be eight "buyers" and eight purchase agreements. However, each of the agreements is cross-defaulted and provides for simultaneous closings, so neither of us can get into a situation where part of the deal closes but not the entire deal.
The Owners argue that Manheim's letter "is clear and unequivocal proof of his intentional use of the corporate form to evade duties owed to condominium purchasers under" the condominium act, and ask us to pierce the corporate veil on that basis. Whether one is attempting to evade a legal duty under the condominium act under these circumstances is determined, in large part, on whether any party is deemed a declarant or dealer. The letter by itself is not dispositive. Moreover, the fact that Manheim formed corporations to implement the purchases is not, alone, a reason to impose liability on anyone. There are many perfectly legitimate reasons why one may decide to form a corporation or corporations to facilitate a real estate or other business transaction. This issue may not be summarily decided on this record.
Relying on Meisel v. M & N Modern Hydraulic Press,[34] the Owners argue that our courts will disregard the corporate form to establish liability "if the corporation has been intentionally used to violate or evade a *514 duty owed to another." The Meisel court identified the following factors as essential to the doctrine of corporate disregard: "[f]irst, the corporate form must be intentionally used to violate or evade a duty; second, disregard must be `necessary and required to prevent unjustified loss to the injured party.'"[35] As to the first element, "the court must find an abuse of the corporate form."[36] "[S]uch abuse typically involves `fraud, misrepresentation, or some form of manipulation of the corporation to the stockholder's benefit and creditor's detriment.'"[37] With respect to the second element, the "wrongful corporate activities must actually harm the party seeking relief so that disregard is necessary."[38]
Our courts will not imply an overt intent to disregard the corporate form from the presence of common directors, shareholders, or a common business address.[39] For the court to treat multiple corporate entities as one, "it must appear that the one so dominates the other as to make the other a mere tool and that their funds and property interests are commingled."[40] Moreover, "[t]he fact that one person dominates both corporations is immaterial if the domination was exerted upon each as a separate concern."[41] Whether "the corporate form should be disregarded is a question of fact."[42]
On this record, the Owners have not shown an abuse of the corporate form sufficient to warrant piercing the corporate veil under Meisel. They have not shown a failure to observe corporate formalities, commingling of assets, or undercapitalization.[43] They have not alleged fraud or misrepresentation. The Owners argue that OPT II through VII are mere "shells," pointing in part to the fact that Manheim was the sole corporate officer of the entities, which all used the same address and registered agent. They also note that the OPT entities maintained the same two model units, used the same purchase and sale agreements and dissolved when the units were resold. But these facts alone do not justify piercing the corporate veil under Washington law.
In sum, the Owners have failed to show, on this record, how the OPT entities were anything other than valid corporate entities. The fact that Manheim created OPT II through VII to avoid the consequence of becoming a "dealer" as defined by the condominium act does not warrant application of the doctrine of corporate disregard.

Attorney Fees
The Owners argue that, because they should have prevailed below, they are entitled to attorney fees under the condominium act. We agree.
RCW 64.34.455 grants the trial court discretion to award attorney fees to the prevailing party in an appropriate case:
If a declarant or any other person subject to this chapter fails to comply with any provision hereof or any provision of the declaration or bylaws, any person or class *515 of persons adversely affected by the failure to comply has a claim for appropriate relief. The court, in an appropriate case, may award reasonable attorney[ ] fees to the prevailing party.
Here, the trial court determined that the respondents were the prevailing party and, after concluding that this was "an appropriate case" for a fee award, ordered that the Owners pay $73,894 in attorney fees, together with statutory costs.
Whether a party is a "prevailing party" for purposes of a fee award is a mixed question of law and fact that we review under the error of law standard.[44] "As a general rule, a prevailing party is one against whom no affirmative judgment is entered."[45] A prevailing party is one that has substantially prevailed.[46] "The determination as to who substantially prevails turns on the substance of the relief which is accorded the parties."[47] A party who prevails on only certain claims may be a prevailing party under the condominium act's fee provision.[48]
In Eagle Point, we upheld a fee award against a condominium developer under the condominium act. We affirmed the trial court's determination that the Homeowners' Association was the prevailing party despite the fact that it did not succeed on all of its claims, and despite the fact that it had refused a pretrial settlement offer greater than the damages awarded at trial.[49] We recognized, however, that it is within the trial court's discretion in such cases to reduce the amount of the fee award "on account of the prevailing party's limited success."[50]
Here, we hold that the Owners should have prevailed below on the question of declarant liability, but uphold the trial court's determination as to dealer liability. Based on that ruling, Owners have prevailed on a major issue and obtained the relief sought.[51] They are the prevailing parties. That does not end our inquiry.
The condominium act authorizes attorney fees to the prevailing party, but only in "an appropriate case." Accordingly, we must next determine whether this is such a case.
In Eagle Point, we affirmed the trial court's determination that the case was an "appropriate" one for the award of fees in favor of the Homeowners Association.[52] In doing so, we reasoned that, although the defendant's "argument was not without merit," the condominium owners "had to incur substantial professional fees in order to enforce their warranties against the declarant, and that [the defendant's] offers were unreasonably low."[53] We also recognized that the condominium act "has a strong consumer protection component."[54] We concluded that the fee provision, "reflects a legislative purpose to ensure adequate representation for aggrieved purchasers of condominiums, and to encourage private action to enforce the act's guarantees."[55] The purpose of the fee shifting provision in RCW 64.34.455 "is to *516 punish frivolous litigation and to encourage meritorious litigation."[56]
We conclude that this is an appropriate case for an award of fees in favor of the Owners. Such an award will promote the Legislature's purpose in enacting the fee provisionto encourage meritorious private enforcement actions. Moreover, the Owners' action was a legitimate effort to enforce the condominium act's consumer protection provisions.[57] Accordingly, we vacate the fee award entered by the trial court, and direct the trial court on remand of this case to award fees in an appropriate amount to Owners for work below.
Both parties ask for attorney fees on appeal under the condominium act's fee provision. Where a statute authorizes fees to the prevailing party, they are available on appeal as well as in the trial court.[58] Because the Owners are the prevailing party on a major issue on appeal, they are entitled to fees. The trial court shall determine the amount of such fees on remand.
We affirm in part and reverse in part the trial court's summary judgment ruling. We remand for the trial court to determine the amount of attorney fees, for trial and appeal, to be awarded in favor of the Owners. The trial court shall also consider and determine such other further relief as is not inconsistent with this opinion.
AGID, C.J., and BAKER, J., concur.
NOTES
[1] In this opinion, we use the short title variants for this legislation that are specified in RCW 64.34.900.
[2] CR 56(c).
[3] Mountain Park Homeowners Ass'n, Inc. v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994).
[4] Mains Farm Homeowners Ass'n v. Worthington, 121 Wash.2d 810, 813, 854 P.2d 1072 (1993).
[5] (Italics ours.)
[6] See RCW 64.34.410 and 64.34.415.
[7] (Italics ours.)
[8] RCW 64.34.020(29).
[9] Allan v. Department of Labor & Indus., 66 Wash.App. 415, 418, 832 P.2d 489 (1992).
[10] Harmon v. Dep't of Soc. & Health Servs., 134 Wash.2d 523, 530, 951 P.2d 770 (1998).
[11] State v. Akin, 77 Wash.App. 575, 580, 892 P.2d 774 (1995).
[12] State v. Standifer, 110 Wash.2d 90, 92, 750 P.2d 258 (1988). See also Brenner v. Leake, 46 Wash.App. 852, 854-55, 732 P.2d 1031 (1987).
[13] City of Tacoma v. Taxpayers, 108 Wash.2d 679, 693, 743 P.2d 793 (1987) (quoting Service Employees Int'l, Local 6 v. Superintendent of Pub. Instruction, 104 Wash.2d 344, 348, 705 P.2d 776 (1985)).
[14] City of Tacoma, 108 Wash.2d at 693, 743 P.2d 793 (citing State v. Stockton, 97 Wash.2d 528, 533, 647 P.2d 21 (1982)).
[15] City of Seattle v. Fontanilla, 128 Wash.2d 492, 498, 909 P.2d 1294 (1996).
[16] Black's Law Dictionary (7th ed.1999) (italics ours).
[17] See Puyallup Valley Bank v. Mosby, 44 Wash. App. 285, 287, 723 P.2d 2 (1986) (recognizing that "a surety who discharges the debts of another succeeds to all rights held by the creditor against the debtor," and concluding that "if the principal's debt to the creditor is secured by property of the principal, the surety acquires by operation of law a kind of property interest in the collateral securing the primary debt.").
[18] Black's Law Dictionary (7th ed.1999) (italics ours).
[19] Webster's Third New International Dictionary 2282 (3d ed.1993) (italics ours).
[20] (Italics ours.)
[21] (Italics ours.)
[22] RCW 64.34.020(13).
[23] Haley v. Highland, 142 Wash.2d 135, 147, 12 P.3d 119 (2000).
[24] The applicable comment states: "3. [RCW 64.34.316(1)] provides that a successor in interest to a declarant may acquire the special rights of the declarant only by recording an instrument which reflects a transfer of those rights."
[25] Eagle Point Condominium Owners Association v. Coy, 102 Wash.App. 697, 713, 9 P.3d 898 (2000).
[26] RCW 64.34.020(13) (italics ours).
[27] Johnson v. Harrigan-Peach Land Development Co., Inc., 79 Wash.2d 745, 753, 489 P.2d 923 (1971) (corporate officer individually liable for conversion of plaintiff's property) (citing Messenger v. Frye, 176 Wash. 291, 295, 28 P.2d 1023 (1934)).
[28] Grayson v. Nordic Construction Co., Inc., 92 Wash.2d 548, 554, 599 P.2d 1271 (1979) (citing State v. Ralph Williams' North West Chrysler Plymouth, Inc., 87 Wash.2d 298, 322, 553 P.2d 423 (1976)).
[29] Ralph Williams, 87 Wash.2d at 322, 553 P.2d 423.
[30] Ralph Williams, 87 Wash.2d at 305-06, 553 P.2d 423.
[31] Ralph Williams, 87 Wash.2d at 306-07, 553 P.2d 423.
[32] Ralph Williams, 87 Wash.2d at 322, 553 P.2d 423.
[33] RCW 64.34.405(3).
[34] 97 Wash.2d 403, 645 P.2d 689 (1982).
[35] Meisel, 97 Wash.2d at 410, 645 P.2d 689 (quoting Morgan, 93 Wash.2d at 587, 611 P.2d 751).
[36] Meisel, 97 Wash.2d at 410, 645 P.2d 689.
[37] Meisel, 97 Wash.2d at 410, 645 P.2d 689 (quoting Truckweld Equip. Co. v. Olson, 26 Wash. App. 638, 645, 618 P.2d 1017 (1980)).
[38] Meisel, 97 Wash.2d at 410, 645 P.2d 689.
[39] J.I. Case Credit Corp. v. Stark, 64 Wash.2d 470, 475, 392 P.2d 215 (1964).
[40] Western Washington Laborers-Employers Health & Security Trust Fund v. Harold Jordan Co., Inc., 52 Wash.App. 387, 393, 760 P.2d 382 (1988).
[41] Western Washington Laborers-Employers, 52 Wash.App. at 393, 760 P.2d 382.
[42] Norhawk Investments, Inc. v. Subway Sandwich Shops, Inc., 61 Wash.App. 395, 398, 811 P.2d 221 (1991) (quoting Truckweld Equip. Co., 26 Wash.App. at 643, 618 P.2d 1017).
[43] See J.I. Case Credit Corp., 64 Wash.2d at 475, 392 P.2d 215 (insufficient showing for corporate disregard despite the fact that one corporation was a wholly owned subsidiary of the other, the secretary-treasurer of one was president of the other, all employees of the subsidiary were paid by the parent corporation, both companies had the same address, credit managers, lawyers, nonresident agents and auditors, and the subsidiary was in business only to handle the retail financing of the parent corporation).
[44] Eagle Point, 102 Wash.App. at 706, 9 P.3d 898.
[45] Eagle Point, 102 Wash.App. at 706, 9 P.3d 898 (citing Andersen v. Gold Seal Vineyards, Inc., 81 Wash.2d 863, 868, 505 P.2d 790 (1973)).
[46] Hertz v. Riebe, 86 Wash.App. 102, 105, 936 P.2d 24 (1997).
[47] Marine Enter., Inc. v. Security Pac. Trading Corp., 50 Wash.App. 768, 772, 750 P.2d 1290, review denied, 111 Wash.2d 1013 (1988).
[48] Eagle Point, 102 Wash.App. at 700, 9 P.3d 898.
[49] Eagle Point, 102 Wash.App. at 700, 9 P.3d 898.
[50] Eagle Point, 102 Wash.App. at 714, 9 P.3d 898.
[51] Eagle Point, 102 Wash.App. at 711-14, 9 P.3d 898 (recognizing that the Association was the prevailing party under the condominium act despite the fact that it did not succeed on all of its claims).
[52] Eagle Point, 102 Wash.App. at 715, 9 P.3d 898.
[53] Eagle Point, 102 Wash.App. at 715, 9 P.3d 898.
[54] Eagle Point, 102 Wash.App. at 713, 9 P.3d 898.
[55] Eagle Point, 102 Wash.App. at 713, 9 P.3d 898.
[56] Eagle Point, 102 Wash.App. at 713, 9 P.3d 898.
[57] Eagle Point, 102 Wash.App. at 713, 9 P.3d 898 (recognizing that the Act has a strong consumer protection component, and that one purpose of the fee provision is to encourage meritorious private enforcement actions while punishing frivolous litigation).
[58] Naqueb Ur-Rahman v. Changchun Dev., Ltd., 84 Wash.App. 569, 576, 928 P.2d 1149 (1997).